UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RHONDA HENDRIX, parent and guardian of
GATLIN PERRYMAN, a minor child,

       Plaintiffs,                            Case No. 3:07-CV-133-MCR-EMT

vs.

EVENFLO COMPANY, INC.,

       Defendant.

_____/

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' *DAUBERT* MOTION
TO LIMIT THE OPINION TESTIMONY OF DEFENSE EXPERT WILLIAM VAN
ARSDELL, Ph.D.**

Defendant Evenflo has disclosed William Van Arsdell, Ph.D. as an expert in this case. Dr. Van Arsdell is the owner of a litigation consulting firm known as Engineering Principles, LLC and works exclusively as a testifying expert for child safety seat and motor vehicle manufacturers. Although Dr. Van Arsdell has an undergraduate, a Master's and a doctorate degree in mechanical engineering, as set forth below he is neither qualified nor competent by virtue of his complete lack of education, training and non-litigation experience to offer some of the opinions he has proffered in this case in the highly specialized areas of: 1) motor vehicle occupant restraint systems design, testing and performance; 2) child safety seat ("CSS") design, manufacturing, testing and performance; 3) occupant kinematics/biomechanics; and 4) compliance with Federal Motor Vehicle Safety Standard ("FMVSS") 213. Accordingly, plaintiffs move for an order precluding him from offering opinions in any of these four areas in which he is neither competent nor qualified. *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Quiet Technology DC-8 v. Hurel-Dubois UK, Ltd.,* 326 F.3d 1333, 1340-41 (11th Cir. 2003).

Not only does he lack competency in the specialized areas outline above, Dr. Van Arsdell also attempts to offer a number of opinions which lack factual or scientific foundation, are based

on an unreliable or non-existent methodology, are contrary to the undisputed facts of the case, and which are otherwise speculative and unreliable.  More specifically, his "methodology" involves an attempt to recreate this accident by running just one (1) test in which an airbag impacts a CSS, utilizing a results oriented contrived test "set-up" that is directly **contrary to the undisputed facts in this case** and as such, it is neither reliable nor relevant and will dangerously mislead the jury.  He and the other Evenflo liability experts then rely on this one flawed test as the primary evidentiary basis for their opinions that the shell failure in the subject CSS was caused by airbag impact.

In addition, he then proffers some other far reaching sub-opinions attempting to offer three alternative explanations for why his one contrived airbag impact test did **not** replicate or accurately recreate the catastrophic damage to the shattered shell found on the accident seat. However, none of these alternative "explanations" were evaluated or proven by his one airbag test, nor have they have been otherwise tested even though they could easily have been tested in the three other sled tests he performed. As such, these highly speculative opinions are based on unproven, unreliable or non-existent methodology and they are purely the conclusory *ipse dixit* of Dr. Van Arsdell, which lacks factual or scientific support and are contrary to the facts of the case.

And finally, Dr. Van Arsdell has proffered certain other untested and factually unsupported opinions relating to plaintiffs' missing fetter pin manufacturing defect claim[1] and its lack of padding design defect claim.

---

[1] On July 29, 2008, Dr. Van Arsdell ran an additional test purporting to test plaintiffs' false latch theory.  However, this test was conducted and a "supplemental" report was served more than a month after the close of discovery.  A motion to preclude this new but belated and untimely "testing" and any opinions based thereon is being filed contemporaneously with plaintiffs' *Daubert* motions. In its July 17, 2008 Order denying Evenflo's motion to strike the supplemental Rule 26(e) reports of plaintiffs' experts, the Court allotted an additional 30 days for "expert discovery" to rectify Evenflo's claim of prejudice saying that it needed more time to re-depose plaintiffs' experts regarding the opinions expressed in their supplemental Rule 26(e) reports for purposes of the *Daubert* and dispositive motions it was preparing.  Contrary to its representations to this Court, Evenflo made virtually no effort to "discover" the basis for the opinions expressed in plaintiffs' experts' supplemental reports. Instead, Evenflo and its experts improperly took the opportunity to conduct extensive amounts of new work and testing to plug the holes in their opinions that were brought to light during their depositions in mid-June, just prior to the June 20 close of discovery. As such, Dr. Van Arsdell's July 29 testing should not be considered by this Court in conducting its *Daubert* inquiry.

As set forth below, all these opinions lack foundation, are speculative and unreliable, could have easily been tested but were not, and are based on unreliable or non-existent or unreliable methodology and should be stricken as a result. *Daubert, supra; Kumho Tire Co., Ltd., supra; Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1113 (11th Cir. 2005).

## I.  FACTUAL BACKGROUND

As the Court is fully aware, one of plaintiffs' primary defect claims is that the Evenflo Discovery CSS is defectively designed because its latch design allows the seat/carrier to be inadvertently and unknowingly "false latched" on to the seat's convenience base.[2]  Discovery has revealed that this design defect is a very serious and potentially deadly hazard that Evenflo's engineers recognized and discussed during the preproduction "Hazard Analysis" for the Discovery, months before production started. Evenflo's engineers determined that this hazard needed to be designed out so the seat's latch could **not** be audibly clicked or latched on the base **unless** the toe of the seat was under the base's J-hook. Testimony from Greg Allison, the former Evenflo engineer who worked on the Discovery's latch design and was involved in the Hazard Analysis process, has confirmed plaintiffs' contention that the false latch design defect was a serious "high priority" hazard that Evenflo was well aware of and acknowledged that it should have but had not been eliminated from the seat's design.

Tragically for Gatlin Perryman, on the evening before his birth when his mother was in the early stages of labor, she struggled into the back seat of her car and placed the seat on the base and heard the seat's latch "click" on to the base. When she pulled up on the seat as directed by Evenflo's instructions and saw that it was snapped on to the base, she erroneously thought she had properly and completely secured the seat to the base.  She had not.

---

[2]In this context, a "false latch" refers to a situation where the parent places the carrier/seat on its convenience base (which is secured by the vehicle's seat belt) and latches it to the base but inadvertently fails to get the rim of the foot end of the seat under the base's "J-hook" which is on the opposite end of the base from where the latch attaches. Even though the foot of the seat is not under the J-hook, when the installer pushes the safety seat down on its base, its latch audibly "clicks" or "snaps" as it latches on to the base.  When the parent/installer then lifts up on the back of the seat/carrier as instructed by Evenflo in its manual, the safety seat is clearly attached to the base and appears to be properly and securely latched to the base when in reality it is not.

When a false latch occurs and the vehicle is in a collision, the carrier can detach from the base.  In this frontal collision accident, plaintiffs maintain that Gatlin's false latched safety seat rotated off the base upon impact and then slammed into the back of the Ford Expedition's console, shattering its brittle, unpadded shell and traumatically injuring Gatlin in the process. Two neutral fact witnesses who arrived at Dr. Hendrix's car shortly after the accident observed Gatlin, still in his CSS, in the back seat and being picked up off the rear seat floorboard by his mother. This unrefuted fact witness testimony supports the testimony of Dr. Hendrix as to the pre and post accident location of the CSS in the back seat of the Expedition.

With no fact witnesses supporting its theory and based only on the opinions of its paid experts, Evenflo basically ignores plaintiffs' latch design defect claim and is contending that Dr. Hendrix is lying about the pre-accident location of her two week old child and his CSS when she testified that he was in the center position of the back seat when the accident occurred.  Dr. Hendrix, a devoted single mother of five children, is also a highly trained healthcare professional who is such a long time diligent user of CSSs with her children that she even used CSSs in boats for her children years before Gatlin (her youngest) was born. Although the fact witnesses, the police and even Evenflo's experts concede that the seat's base was properly secured/seat belted in the middle position of the rear/back seat of the SUV as Dr. Hendrix claims, its hired experts are also claiming that the carrier/seat portion of the Discovery (with Gatlin strapped in it) was in the front passenger seat, most likely unrestrained by the Expedition's seat belt, where it was allegedly impacted by the airbag during this accident.

Apparently Evenflo is going to contend that the eye witness who arrived at the vehicle within seconds after the accident and who saw Dr. Hendrix open the back door of her car and pick the seat up off the rear seat floorboard (with Gatlin still strapped in it) and the fireman who also arrived soon after the accident and saw Gatlin in his safety seat in the back seat area and are all either lying or are mistaken about what they saw.  Evenflo is also claiming that the highly experienced Florida State Trooper (a certified Child Passenger Safety Technician trained in the installation and use of CSSs) who investigated the accident, talked to all the fact witnesses,

4

found the shattered pieces of the safety seat in the rear seat floorboard and ultimately concluded that Gatlin had been restrained in the center position of the rear seat, is mistaken as well.

In addition, with no testing or witness testimony to support his contentions, Dr. Van Arsdell claims that the three inch long fetter pin missing from the latch on Gatlin's safety seat was somehow knocked out of the seat by this alleged airbag impact. However, neither his one airbag test nor the three airbag tests run by plaintiffs' experts proved this wild theory. In fact, there is no test data or documented real world proof that an airbag impact can knock a fetter pin out of the Discovery's latch.

With respect to his design opinions, Dr. Van Arsdell attempts to offer opinions as to the design of the seat's latch. Totally ignoring the testimony of Dr. Hendrix as well as the Discovery's Hazard Analysis about this propensity in the design of the seat's latch, Dr. Van Arsdell attempts to offer opinion about the design of the seat's latch and not only claims that it is not defective nor unreasonably dangerous, he also claims that Gatlin's seat was not false latched at the time of the accident. Again, with no qualifications or testing to support his opinions, he also tries to claim that EPS padding on the inside of Gatlin's seat, similar to what Evenflo now uses on its seats, "would not have been effective in reducing the forces applied to Gatlin."

Dr. Van Arsdell will also try to claim that because the Discovery purportedly met the bare minimum performance standards of FMVSS 213 that allow a company to sell CSSs in the United States, it is neither defective nor unreasonably dangerous.

Dr. Van Arsdell is not even remotely qualified or competent to speak on these specialized topics and with respect to the opinions outlined above, his opinions are nothing more than unreliable speculation and should be precluded accordingly.

## II. EXPERT WITNESS TESTIMONY

The admission of expert witness testimony is governed by F.R.E. 702, which reads as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if: (1) the testimony is based upon

5

> sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

The rules governing expert witness testimony "grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" *Kumho, supra,* 526 U.S. at 148 (quoting *Daubert, supra,* 509 U.S. at 592).

Under F.R.E. 702 and *Daubert*, this Court is obligated to act as a "gatekeeper" to the admission of expert testimony. In the Eleventh Circuit, this requires the Court to engage in a three part inquiry to determine admissibility. More specifically, the Court must consider:

1. Whether the expert is qualified to testify competently regarding the matters he intends to address;

2. Whether the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and

3. Whether the testimony will assist the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. en banc 2004); *Quiet Technology DC-8, supra,* 326 F.3d at 1340-41. While there is overlap between these inquiries, "these are distinct concepts that courts and litigants must take care not to conflate." *Id*. at 1341. Assuming the expert survives the analysis of his qualifications and competence, the court's role is to then perform an "exacting analysis" of the expert's <u>*methodology*</u>, not the expert's conclusions. *Id*.; *See also, Rink v. Cheminova, Inc*., 400 F.3d 1286, 1291-94 (11th Cir. 2005); *McClain v. Metabolife International, Inc*., 401 F.3d 1233, 1237-39 (11th Cir. 2005).

With this basic framework in place, we first turn to an analysis of the qualifications and competency of Dr. Van Arsdell in the areas in question and then to the methodology (or lack thereof) he utilized to reach the factually unsupported and conclusory opinions he attempts to offer in this case.

### III.  VAN ARSDELL'S OPINIONS THAT HE IS NOT COMPETENT TO GIVE

Van Arsdell's Rule 26 report is attached hereto as *Exhibit 1*. On pages 22-31 of the report, he lists and discusses more than twenty opinions he apparently intends to offer to the jury as "expert opinions."  Plaintiffs are not challenging his competence to render all the opinions listed in his report.  Although there is some overlap, the opinions that are the subject to this *Daubert* challenge can be grouped into the areas of: a) motor vehicle restraint system design, testing and performance; b) child safety seat design, manufacturing, testing and performance; c) occupant kinematics/biomechanics; and d) compliance with Federal Motor Vehicle Safety Standard ("FMVSS") 213.   As set forth below, before deciding to hire himself out as an expert witness to safety seat and vehicle manufacturers, he had absolutely no education, training or experience to qualify him to render opinions in these highly specialized areas.

### IV.  ANALYSIS OF DR. VAN ARSDELL'S QUALIFICATIONS

As noted above, the Eleventh Circuit expressly requires, as a threshold matter, for an expert to be able to "testify competently regarding the matters he intends to address."  *Quiet Technology*, 326 F.3d at 1340.  The competency of a witness to testify in federal court is determined by reference to state law.  F.R.E. 601; *McDowell v. Brown*, 392 F.3d 1283, 1295 (11th Cir. 2004) ("Rule 601 . . . incorporates the *Erie* mandate by expressly providing that when State law supplies the rule of decision, the competency of a witness shall be determined in accordance with state law.").  It is only *after* a witness is determined to be competent that the Rule 702 analysis begins.  *Id*.

In his report, Dr. Van Arsdell claims to be an expert in the design, operation, usage and performance of automotive occupant restraint systems, which includes seat belts, airbags and CSSs. (*Exhibit 1,* pg. 1) While it is true that he has degrees in mechanical engineering from the University of Arizona, University of Illinois at Urbana-Champaign, and M.I.T, his areas of graduate studies were highly specialized and are dramatically different from the specialized fields in question in this motion. (*See Exhibit* 5, Van Arsdell's CV.)  In fact, his Master's thesis was entitled "*The Effect of Particle Size on the Thermomechanical Fatigue of Metal Matrix*

7

_Composites._" (_Id._) His Ph.D. thesis dealt with "_Subcritical Crack Growth in Polysilicon MEMS_ (Microelectromechanical Structures)" (_Id._)  No doubt he is qualified to address these technical issues he researched in his graduate studies, but that does not establish that he is qualified to testify as a CSS expert or as an expert in the other areas in question in this motion.

As is clearly established below, Dr. Van Arsdell does **not** have the requisite education, training or **pre-litigation** experience to be qualified to testify as an expert witness on these topics under the requirements of F.R.E. 702 and _Daubert_.

### A.  Lack of Qualifications in Motor Vehicle Restraint System Design, Testing and Performance

Since Dr. Van Arsdell's opinion testimony involves conclusions about motor vehicle restraint systems (seat belts and airbags) and how they might interact with another restraint system (a CSS) in this accident, one would expect someone holding himself out as a litigation "expert" to have some education, training or experience in the design and performance of motor vehicle occupant restraint systems **before** he starts testifying as an expert witness.  In previous sworn testimony, it has been unequivocally established that Dr. Van Arsdell has none:

- He has not studied, at any university at any time, the design or performance of restraint systems in motor vehicles. (_See Exhibit 2_, Van Arsdell's 2006 deposition in the case of _Nubia Cardenas et al. v. Dorel Juvenile Group, Inc_, United States District Court for the District of Kansas, Case No.: 04-2478-KHV/DJW, pg. 34, L. 10 - 14).

- He has not, while at any university, performed any testing that dealt with the design or performance of motor vehicle restraint systems. (_Id._ at pg. 35, L. 7 – 14).

- He did not, during a two year stint with General Motors, ever work in the design or performance of motor vehicle seat belt systems. (_Id._ at pg. 38, L. 4 – 8) The closest he came to dealing with restraint systems was to match the color of seatbelt webbing to the color of the interior trim – a role he admitted was one of "interior decorator." (_Id._ at pg. 38, L. 11 – 17).

- He did not, while at GM, do any dynamic testing or crash testing of automotive seat belt systems.  (_Id._ at pg. 38, L. 18 – 23).

- While a part-time employee at Exponent/FAA (an engineering consulting firm) while he was in school, he was not involved in the testing or analysis of motor vehicle restraint systems. (_Id._ at pg. 40, L. 6 – 10).

- He has never designed a restraint system for a motor vehicle.  (_Id._ at pg 53, L. 1 – 4).

- He has never designed a component for a restraint system for any motor vehicle. (*Id*. at pg 53, L.  5 - 7).

- **Before** he went to work full time for Exponent doing litigation consulting upon graduation, **he had no experience in the design or performance of vehicle restraint systems.**  (*Id*. at pg. 60, L. 18 – 23). (emphasis added)[3]

Clearly, Dr. Van Arsdell has no formal education in the design or performance of vehicle restraint systems in which he now claims expertise. To see if he meets the threshold finding of competency, the Court must then look to see if, since graduating, he has somehow gained "real world" training or experience in this field **before** he started hiring himself out as an expert in these areas.  *Jones v. Lincoln Elec. Co.,* 188 F.3d 709, 723-24 (7th Cir. 1999).[4]  When you look to see if Dr. Van Arsdell had **any** real world "hands-on" experience in this area **before** he joined Exponent and started testifying as an expert in the field, the answer is a resounding "no."

To the contrary, as noted above **all** of the qualifications he now claims in this area are **solely** derived from his work as a "hired gun" expert testifying primarily for CSS and automobile manufacturers in litigation.   However, holding oneself out as an expert in litigation does not qualify him as one. *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989) ("…it would be absurd to conclude that one can become an expert **simply by accumulating experience in testifying**.") (emphasis added)[5]

Since Dr. Van Arsdell has no formal education or real world training or experience in this highly specialized area, Evenflo may try to claim he is an expert simply because he has a Ph.D.

---

[3] In his deposition in this case *(Hendrix, et al. v. Evenflo)*, inquiry was made about whether or not, since the last time plaintiff's counsel deposed him, Dr. Van Arsdell has undertaken any type of additional education or training and Dr. Van Arsdell succinctly replied "no." More specifically, he was questioned about whether or not since his deposition in the *Nubia Cardenas* case, he has acquired any additional education, training or non-litigation related experience in any of the areas in question and the answer was that he had not. *Exhibit 3,* deposition of Van Arsdell in this matter, at pg.13-14 and 19-26.

[4] The 7th Circuit found that district court abused its discretion by not precluding expert in material science and metallurgy who was not a toxicologist or medical doctor, from offering opinions regarding the toxicology or health effects of manganese on the human body.  "[T]he kind of experience that Rule 702 contemplates as the basis for qualifying an expert to testify at trial [is] **extensive hands-on experience over a meaningful period of time during which a person develops a working expertise in a certain area.**" *Jones*, 188 F.3d at 724 (emphasis added) (citing, *U.S. v. Tipton*, 964 F.2d 650, 654 (7th Cir. 1992)).

[5] *See also*: *Tyus v. Urban Search Management,* 102 F.3d 256, 263 (7th Cir. 1996) ("the district court must ensure that it is dealing with an expert, not just a hired gun."); *see also*, *Wagner v. Hesston Corp*., 450 F.3d 756, 758-759 (8th Cir. 2006);  *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 615 (S.D.N.Y 2007); *Berlyn Inc. v. Gazette Newspapers, Inc.*, 214 F.Supp.2d 530, 535 (D.Md. 2002); *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 597 (9th Cir. 1996); *McCarthy v. Abromavich*, 966 F.2d 1443, *4 (4th Cir. 1992) (unpublished); *Tokio Marine & Fire Ins. Co. Ltd. v. Grove Mfg. Co.*, 958 F.2d 1169, 1174 (1st Cir. 1992)

in Mechanical Engineering and has taken courses physics, dynamics, materials, chemistry, etc...
Under F.R.E. 702, simply having his "mechanical engineering" degrees does not make Dr. Van
Arsdell an expert in any of these areas.  *See*, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d
965, 970 (10th Cir. 2001); *Alfred v. Caterpillar, Inc*., 262 F.3d 1083, 1088 (10th Cir. 2001)
(Mechanical engineer was not qualified to testify concerning human factors opinion); *Alexander
v. Smith & Nephew,* 98 F.Supp.2d 1310, 1315 (N.D.Okla.2000) ("[t]he simple possession of a
medical degree is insufficient to qualify a physician to testify as to the advantage of a spinal
fixation device, the medical causation of spine-related ailments, or the mechanical functioning of
an orthopedic implantation device ").

    At a minimum, Dr. Van Arsdell's alleged "expertise" in the design and performance of a
motor vehicle's restraint system has failed the first prong of its *Daubert/Kumho* burden.  *Frazier,
supra*, 387 F.3d at 1260.

### B. Lack of Qualifications in Child Safety Seat Design, Manufacturing, Testing and Performance

    Not only does Dr. Van Arsdell lack the qualifications to offer opinion testimony about
occupant restraint design generally, a review of his education, training and experience **before** he
started testifying as an expert establishes that he is equally unqualified to offer "expert"
testimony about a specific sub-set of occupant restraint systems – the design, manufacturing,
testing and performance of CSSs.

Q:    Have you ever at any point in your career designed a child safety seat?

A:    No.  (*Exhibit 2* at pg. 53, L. 16 – 18).
                            *    *    *
Q:    Have you ever designed a component for a child safety seat?

A:    No.  (*Id*. at pg. 53, L. 23 through  pg. 54, L. 1).
                        *    *    *
Q:    Have you done crash testing of safety seats designed to analyze the performance
      of child safety seats in **non-litigation matters**? (emphasis added)

A:    No, sir, I don't believe so.  (*Id*. at pg. 54, L. 14 – 21).
                        *    *    *
Q:    And from the point in time that you started to work at Exponent up until the
      present time, all of the testing that you have been hired to do relative to child
      safety seats has been in the defense of these manufacturers in lawsuits, is that
      correct?

A:      I believe so. (*Id*. at pg. 56, L. 5 – 11).

                \*   \*   \*

Q:      [B]efore you went to work at Exponent you had no experience in the design or performance of . . . child safety seats?

A:      Not specifically, no. (*Id.* at pg. 60, L. 18 – 23).

Moreover, none of Dr. Van Arsdell's academic studies have dealt specifically with the design, performance or testing of CSSs (*Id*. at pg. 34, L. 10 – 22).   None of the testing he has done in conjunction with his graduate studies or his employment during school dealt with the design and performance of child safety seats. (*Exhibit 2* at pg. 35, L. 7 – 14; *Id*. at pg. 40, L. 1 – 5).   He has never been employed outside of litigation by a child safety seat manufacturer.  (*Id.* at pg. 53, L. 11 – 15).   The *only* non-litigation testing on child safety seats he has *ever* been involved with had *nothing* to do with the evaluation of child safety seats in a moderate speed frontal impact crash like the one at issue here.  (*Id*. at pg. 60, L. 18 – pg. 66, L. 8). Instead, it was a one to two day "spin test" he performed while working at Exponent trying to create some credentials where none existed. (*Id.*).

In an attempt to circumvent the fact that he has no academic or real world experience before he started hiring himself out as an expert, Evenflo may also try to argue that Dr. Van Arsdell has been permitted to testify extensively in these areas over the years since he joined Exponent.[6]   However, the fact that Dr. Van Arsdell has been permitted to testify as a retained "expert" in other cases, most likely in state courts that do not follow *Daubert*, since he went to work as a professional testifier, does not mean that he is qualified to do so in this case. *See, Elcock v. Kmart Corp.*, 233 F.3d 734, ftn. 5 (3ʳᵈ Cir. 2000).

And last but not least, even a cursory review of Dr. Van Arsdell's CV reveals that very few publications/presentations on his list that deal in any fashion with vehicle restraint systems or CSSs have all been generated since 2005 **(after he started testifying as an retained expert)** and are documents he co-authored with other testifying experts. (*See Exhibit 5*) Obviously these

---

[6] In his deposition, Dr. Van Arsdell admitted that he has testified 38 times for product manufacturers and of those 38 times he has testified, 26 of them have been for CSS manufacturers.  And of those 26 times he has testified for CSS manufacturers, 8 of those (not including his deposition in this case) have been for Evenflo. *Exhibit 3,* pg.15, L. 18-25- pg. 16, L.9; *See also, Exhibit 4,* Van Arsdell's Rule 26 testimony list.

are Dr. Van Arsdell's thinly veiled attempts to generate some type of qualifications when he has none in this area.  Under F.R.E. 702, Dr. Van Arsdell's co-authorship of a few articles while working as a testifying expert does **not** qualify him as an expert in an area where he is not otherwise competent.[7]

Dr. Van Arsdell is, frankly, nothing more than a bright engineer who is making far more money testifying as a CSS industry "expert" than he did when he was working as an "interior decorator" for GM.  As seen above, however, the "fact" that CSS manufacturers regularly hire him to offer "opinions" does not make him an "expert" in anything.  Outside the context of litigation experience, he simply has no relevant education, training, experience or background in the design or performance of any type of restraint system, let alone those specialized devices designed to restrain and protect young children in automobile crashes.

At a minimum, Dr. Van Arsdell's alleged "expertise" in child safety seat design, manufacturing, testing and performance has failed the first prong of its *Daubert/Kumho* burden. *Frazier, supra*, 387 F.3d at 1260.

## C.  Lack of Qualifications in Occupant Kinematics and Biomechanics

A careful reading of Dr. Van Arsdell's report reveals that Evenflo may attempt, directly or indirectly, to elicit testimony from this witness relative the movement of Gatlin both prior to and as a result of the alleged airbag impact during the accident sequence. (*See Exhibit* 1, pgs. 23-24, 26)  More specifically, it appears that Van Arsdell will claim that this pre-impact movement resulted in Gatlin's seat moving closer to the airbag and that post airbag impact movement might explain how he ended up in the back seat. (*Id*. at pg. 23).  In addition, it appears that he will attempt to refute plaintiffs' kinematic analysis of Gatlin's movement in the back seat.(*Id*. at pg. 24). And last but not least, it appears that he will attempt to render biomechanical/injury causation opinions regarding the effectiveness of EPS padding in reducing injuries and how he

---

[7] The Advisory Committee Notes to F.R.E. 702 (2000 Amendments) provide additional factors a court can consider – especially pertinent here where the "expert" is of the "hired gun" variety.  These factors include whether the expert is "proposing to testify about matters growing out of research he has conducted **independent of litigation** or **whether his opinions have been developed expressly for purposes of testifying**…" (emphasis added)

opines that it would have had no effect on Gatlin's injuries in this case. (*Id.* at pg. 23).  These are clearly occupant kinematic and biomechanical opinions he is not qualified to give.

In the field of trauma research, "biomechanics" is defined generally as "the science that examines forces acting upon and within a biological structure and the effects produced by such forces." *(Hay, 1973)*. This definition implies an understanding of at least two areas: (i) biological structures and (ii) how the human body moves during a crash (i.e. occupant kinematics).  In essence, the biomechanical expert tries to determine how trauma and injury occur, how they affect the human body, and how stress and strain result in injuries to living human tissues.[8]

The occupant kinematic and biomechanical analyses in this complex case are critical given the diametrically opposed positions of the parties as to how Gatlin moved during the accident, what he impacted and thus how his head and neck injuries occurred. So does Van Arsdell have the qualifications to offer such opinions?   As the evidence set out below conclusively establishes, the answer is clearly "no."

Dr. Van Arsdell did not go to medical school. He has never audited any courses in medical school. He does not have a degree in biomechanical engineering. He has not taken any undergraduate or graduate school courses in biomedical engineering, human anatomy, human physiology, biomechanics, human injury causation, or human injury thresholds. (*Exhibit* 2, pg. 71, L. 14 through pg. 73, L. 12).  He has never done any testing at any university in an effort to evaluate injury causation to humans in various crash scenarios, and has never even participated in an autopsy. (*Id.* at pg. 74, L. 3-18).   Although he claims to have evaluated occupant kinematics in supposedly "confidential" tests (tests he refuses to discuss in detail), he admits that even these "tests" did not involve the kinematics of a child in a child safety seat in a crash. (*Id.* at pg. 77, L. 10-14).

---

[8] Expertise in this area is essential in understanding how a restraint system helps the occupant of a moving object (fighter jet, automobile, child safety seat, rollercoaster, etc.) "ride down" the physical forces created by deceleration by coupling the occupant tightly to the object and then spreading the loads created by that deceleration to various parts of the occupant's body.   Given the complexity of these systems and their interaction with human anatomy, how they perform generally, as well as how any given system might perform under certain specific parameters, are subjects on which expert testimony is typically required and helpful to the jury.

Van Arsdell's background and education is equally void from an occupant kinematics standpoint. He has never taken any courses that dealt explicitly with human occupant kinematics. *(Id.* at pg.. 72, L. 22  through pg. 73, L. 6). He has never done any testing at any university that was designed to evaluate occupant kinematics. *(Id.* at pg. 73, L. 21 through pg. 74, L. 2). He has not taken any post-graduate courses in occupant kinematics for humans. (*Id.* at pg. 74, L. 24 through pg. 75, L. 7). He has not taken any courses, ever, that dealt with human occupant kinematics in motor vehicle crashes. (Id. at pg. 75, L. 11-14). As such, he has no qualifications to testify in front of a jury about how Gatlin and his seat would have moved during this accident.

Clearly, Dr. Van Arsdell has no qualifications whatsoever to address the cause of Gatlin's injuries under Florida law since he is not a medical doctor. *Grenitz v. Tomlican*, 858 So.2d 999 (Fla. 2003). Nor is he qualified to discuss whether or not EPS energy absorbing padding would have mitigated Gatlin's head injury in this accident since he is not a doctor nor has had any education or real world experience in this field of injury causation.

In sum, Dr. Van Arsdell has no training, experience or education in injury causation, biomechanics, occupant kinematics or any other related subject. He has never taught on these subjects, has never written a paper on them (let alone one subjected to peer review), and has done no tests to confirm any of the kinematic hypotheses set out in his report. Rather, his **only** "experience" has been developed working as a highly paid witness for product manufacturers, and primarily CSS manufacturers, involved in litigation and that is not enough. As stated in *Thomas J. Kline, Inc., supra*, "[I]t would be absurd to conclude that one can become an expert simply by accumulating experience in testifying." 878 F.2d at 800; *Tyus, supra*, 102 F.3d at 263; ("the district court must ensure that it is dealing with an expert, not just a hired gun.")

At a minimum, Dr. Van Arsdell's alleged "expertise" in occupant kinematics and biomechanics has failed the first prong of its *Daubert/Kumho* burden. *Frazier, supra*, 387 F.3d at 1260. The testimony should be excluded.

### D.  Lack of Qualifications to Address Compliance with FMVSS 213

As he does in every case in which he testifies, Dr. Van Arsdell also offers the opinion that the Discovery complied with "all applicable FMVSSs" and it was, therefore, not defective nor unreasonably dangerous.[9] (*Exhibit 1*, pg. 31, ¶ 21) While he has written two papers on the legal history of the standard (when it was adopted, amended, etc.), his experience in actually interpreting and applying it is nonexistent:

> Q:   When you were working at General Motors for those two years in between your bachelor's and master's programs, did you study FMVSS-213?
>
> A:    No.
>
>         \*   \*   \*
>
> Q:   Relative to FMVSS-213 for child safety seats, have you ever been hired by NHTSA in any capacity to run any tests or perform any testing or evaluations?
>
> A:    No.
>
>         \*   \*   \*
>
> Q:   Before you wrote your paper on the history of 213 in 2005, had you ever had any formal or specialized training in FMVSS-213?
>
> A:    I'm not sure that any exists, but the answer is no. (Exhibit 2, pg. 68, L. 2- pg. 69, L. 8).

His lack of education, or training and experience with FMVSS 213 notwithstanding, Dr. Van Arsdell has, as seen above, no relevant background in either the design *or* performance of *any* type of occupant restraint system, including child safety seats. So even if he has shown that he knows how to read a federal standard and regurgitate it in a "historical" context, the fact is that he cannot establish any expertise in the application of the standard to *any* real world child safety seat, let alone the Discovery.  Absent such expertise, he cannot apply the law (FMVSS 213) to the facts of the case (the Discovery's design) to form the legal conclusion that the Discovery complies with the standard. *Cook*, *supra*, 402 F.3d at 1112-13, ftn. 8 (Affirming trial court's exclusion of expert testimony and noting that "courts must remain vigilant against the

---

[9] Because this case involves a false latch design defect hazard in the Discovery that could result in as seat/base detachment in foreseeable impacts, plaintiffs do not concede that the Discovery's alleged compliance with FMVSS 213 is even relevant given the fact that Evenflo concealed critical information regarding this defect from NHTSA. *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1520-21 (10th Cir. 1996), overruled on other grounds by *Kumho Tire Co., Ltd.*, *supra*, 526 U.S. 137.  The admissibility of the regulation will, depending on the Court's ruling on this Motion, be addressed with a motion *in limine*.

admission of legal conclusions" from expert witnesses); *Hartzler v. Wiley*, 277 F.Supp.2d 1114, 1117-18 (D.Kan. 2003).

As with his other "expertise," all Dr. Van Arsdell has done to become familiar with the subject matter of this opinion is testify repeatedly for CSS manufacturers.  When coupled with the complete absence of qualifications to address the biomechanical performance of safety seats, the complete absence of design experience with CSSs and the fact that the only "testing" he has done on CSSs has been litigation based, it is clear that his opinions on the Discovery's alleged compliance with the regulation are nothing more than unreliable speculation and guesswork from a "hired gun." He should be precluded from offering them.

### V.  OPINIONS WHICH LACK FACTUAL OR SCIENTIFIC FOUNDATION, ARE CONTRARY TO THE FACTS OF THE CASE AND WHICH ARE OTHERWISE SPECULATIVE AND UNRELIABLE

Not only does he lack competency in the specialized areas outlined above, Dr. Van Arsdell also attempts to offer a number of opinions which lack factual or scientific foundation, are contrary to the undisputed facts of the case, and which are otherwise speculative and unreliable.

The third prong of F.R.E. 702, reads as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if: …(3) the witness has applied the principles and methods reliably **to the facts of the case**. (Emphasis added)

Courts have also held that "[e]xpert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or **contrary to the facts of the case**." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006) (emphasis added) (*citing Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1056-57 (8th Cir. 2000).  "When the assumptions of an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 144 (4th Cir. 1994) (holding trial court abused discretion in allowing testimony of expert witness "espousing an opinion based on assumptions which find no support in the record.").

By ignoring the facts revealed during discovery and basing his opinions on assumptions contrary to the facts of the case, Dr. Van Arsdell is violating the third prong of the *Daubert/Rule 702* inquiry because his self-professed expertise will not help the jury to "understand the evidence or to determine a fact in issue" and will only serve to mislead them. *See Frazier*, *supra* at 1260; *Quiet Technology, supra* at 1340-41.

### A.  Van Arsdell's Airbag Impact Test  Is Irrelevant, Unreliable And Misleading Since It Is Based On Assumed Facts That Are Contrary To The Undisputed Facts Of The Case

As explained in detail below, all of the eyewitnesses at the scene of the accident contradict Evenflo's experts' theory that Gatlin and his Discovery seat were located in the right front passenger seat at the time of the accident. In a desperate effort to impeach the testimony of Dr. Hendrix, as well as these eyewitnesses, Evenflo relies on one accident recreation sled test run by Dr. Van Arsdell in an attempt to create identical airbag impact damage on an exemplar CSS that can then be compared to the subject seat to try and prove that Gatlin and his Discovery seat were actually located in the right front passenger seat at the time of the accident.

Of critical importance to the Court in its *Daubert* gatekeeper inquiry is the fact the methodology for this Van Arsdell test depended upon two critical pre-supposed facts or "conditions" for which there is no proof that either existed at the time of the accident.  These conditions are: (1) that right front passenger seat was located two notches aft/rear of full forward at the time of the accident; and (2) that the handle of Gatlin's Discovery seat was located in the "up" position at the time of the accident.[10]  As is demonstrated below, not only is there no proof that these assumed facts/conditions actually existed at the time of the accident, they are in direct conflict with the **unrefuted facts** revealed during discovery.  Therefore, the Van Arsdell airbag test is irrelevant, highly misleading and therefore inadmissible.   *Daubert, supra; Kumho Tire Co., Ltd., supra; Cook, supra*, 402 F.3d at 1113.

---

[10] Repeated, reliable and unchallenged testing performed by Mr. Whitman has proven that if the Expedition's seat was in the full aft/rear position, a deploying Expedition airbag **will not hit, break or leave any marks on the back of a CSS**.  Plus, if the large handle of the seat is in the "down" as Dr. Hendrix and eyewitness Lorena Cottrell testified, then **the handle is directly in between the seat back and the airbag**, thereby preventing airbag contact with the seat back.  So Evenflo's "experts" simply ignored the witness testimony and assumed the handle was "up."

1.    **Van Arsdell's airbag test is unreliable and misleading because it ignores the unrefuted facts that establish that at the time of the accident, the right front passenger seat was in the full aft/rear position on the seat's track.**

On the morning after the accident, Dr. Hendrix took photographs of the interior of the SUV that accurately reflected the condition of its interior, including the location of the passenger seat at the time of the accident. (*Exhibit 7*-Dr. Hendrix's deposition, pg. 258, L. 18-21; pg. 259, L. 6-9; pg. 364, L. 4-13); (*See Exhibit 8*-post-accident photos of interior); (*Exhibit 6*, R. Perryman deposition, pg. 54, L. 10-17).  Unrefuted scientific analysis of these photographs proves that the seat in the full aft/rear position on its track. (*See Exhibit 9*-Dr. Benedict's deposition, pg. 164, L. 7 – pg. 165, L. 21); (*Exhibit 10*- Dr. Benedict's Supplemental Report, pg. 10); (*Exhibit 3*, Dr. Van Arsdell's deposition, pg. 76, L.20- pg. 77, L.6)

Ignoring the post accident photographs depicting the right front passenger seat in the full aft position, Dr. Van Arsdell ran his one airbag impact test with the seat **two notches back from full forward**.(*Exhibit 1*, pg. 19)  Discovery has revealed no witness testimony or other evidence supporting this assumption. (*Exhibit 3*, pg. 80, L.10-13)

To the contrary, Robert Perryman, Gatlin's paternal grandfather, testified that he rode in the right front passenger seat **on the day before the accident** and that the seat "would have been really far back for me."[11]   (*Exhibit 6* - Robert Perryman's deposition, pg. 45, L 25 – pg. 46, L. 21). There has been no testimony that the right front passenger seat was moved from this "really far back" position prior to the accident.[12]   Therefore, the **unrefuted** testimony of Robert Perryman is that the passenger seat was "really far back" on the day of the accident.  Even Dr. Van Arsdell admits that there is no evidence or testimony that the right front seat placement depicted in the post-accident photographs was not its location at the time of the accident. (*Exhibit 3*, pg. 76, L.20- pg. 77, L.6)

---

[11] Plaintiffs note that Robert Perryman's description of the seat position as "really far back" is not quantified. However, Mr. Perryman also testified that due to his very large size, when he drove the Ford Expedition to Dr. Hendrix's home after the accident, he had to move the driver's seat "all the way back." *Id*. pg. 34, L. 6 – pg. 35, L. 21.
[12] Robert Perryman stated that neither he nor Dr. Hendrix moved the seat.  *Id*. pg. 45, L. 25 – pg. 46, L. 6; pg. 64, L 2-11.

The objective evidence of the right front seat's position, coupled with the unrefuted testimony of Robert Perryman explaining **how** and **when** the passenger seat got in that post accident location, conclusively establish that the right front passenger seat was in the full aft (or rear) position at the time of the accident.  Before running his test, Dr. Van Arsdell never even attempted to determine its location on the seat track through photographic analysis of the post-accident photos **but not does not dispute the analysis of plaintiffs' experts' that in these post accident photographs, that the seat was full aft.**  (*Exhibit 3*, pg. 79, L. 12 – pg. 80, L. 13).

Trying to explain why he ignored the unrefuted objective photographic evidence as to the seat's location on its track, Dr. Van Arsdell claims he chose the "two notches back from full forward" position for his test based on the testimony of Dr. Hendrix that her seat was "full forward" and the passenger seat was "a little bit beyond—behind that" which he considered to be the "most reliable" evidence. (*Exhibit 3*, pg 75, L.7- pg. 77, L.6; *Exhibit 1*, pg. 19)  However, a thorough review of Dr. Hendrix's testimony shows Dr. Van Arsdell knowingly misrepresented her testimony about the seat position and that his contention that her testimony was the "most reliable" evidence upon which to base his test is ludicrous, at best.

Contrary to Van Arsdell's assertion, Dr. Hendrix testified that because she was shorter than most people, she placed her seat "up" closer to the steering wheel. [13]  (*Exhibit 7*, pg. 226, L. 8-13). She testified that, at the time of the accident, "[t]he passenger seat was a little bit further back than mine."  *Id*. pg. 226, L. 18-23.  Even if Van Arsdell could somehow accurately quantify what "a little bit further back" is, the passenger seat's position must still be compared to the driver's seat position (a position which is also not clearly established by her testimony that it was "up" closer to the steering wheel).  Plus, there is no showing that Dr. Hendrix even knew that Mr. Perryman had slid the passenger seat all the way back when they went to the store on the evening before the accident.  So not only is Dr. Hendrix's testimony about the location of the front passenger seat vague and non-specific, based on the testimony of Robert Perryman that he moved the seat "**really far back**" on the day before the accident, it is also unreliable and potentially misleading.

---

[13] Dr. Van Arsdell misrepresented Dr. Hendrix's testimony.  He claimed that Dr. Hendrix testified that her seat was "full forward."  *Exhibit 3*, pg. 75, L. 23 – pg. 76, L. 10.  In fact, Dr. Hendrix made no such statement.

In order for this Court to hold that Dr. Van Arsdell's "two notches back" test setup is somehow supported by Dr. Hendrix's vague testimony, the Court would have to ignore the objective, unquestioned photographic evidence and make the same two unsupported assumptions that Dr. Van Arsdell did. The Court would first have to assume that when Dr. Hendrix testified that her seat was "up" she really meant to say that her seat was "all the way up" or full forward. Then the Court would also have to assume that when Dr. Hendrix testified that the passenger seat was a "little bit further back than mine" she really meant to say that it was two notches back of full forward. There is no factual basis whatsoever for either of these assumptions.

Of course, the motivation behind Dr. Van Arsdell's arbitrary and erroneous seat placement in Sled Test #1 is not difficult to determine. By placing the right front passenger seat two notches aft of full forward in this test, the child seat was positioned less than six inches from the air bag module. (*Exhibit 11*- Scott deposition, pg. 111, L. 2-7). At this point-blank range, a significant destructive force could be guaranteed because the airbag would deploy at a speed of 200 miles per hour. (*Id*. pg. 111, L. 2-7; *Exhibit 12*- Scott summary judgment affidavit, ¶ 13). In other words, the closer he put the seat to the airbag, the more likely it was that Dr. Van Arsdell could shatter the shell of his test seat and leave sawtooth marks on it. Unfortunately for Evenflo, even with this contrived test setup, Dr. Van Arsdell was **not** able to recreate the shattered damage to the seat's shell or the sawtooth marks on the belt hook.

### 2. The evidence of the case establishes that handle of Gatlin's Discovery seat was placed in the "down" position at the time of the accident.

Another key issue involves the placement of the Discovery's seat handle. Van Arsdell ran his airbag impact test with the seat's handle in the "up" position. However, Dr. Hendrix testified that the handle was in the "down" position at the time of the accident. (*Exhibit 7*, pg. 394, L. 5-9). Eyewitness Lorena Cottrell testified that she was "85 percent certain" that the handle of the car seat was not in the "up" position. (*Exhibit 13*- Lorena Cottrell deposition, pg. 17, L. 9-21). She testified that if the handle had been in the "up" position, it would have been sticking up in front of Dr. Hendrix's face when she picked Gatlin up off the back seat floorboard and cradled

the carrier in her arms, which she did not recall seeing. (*Id*. pg. 17, L. 22-25).[14] No other witness offered testimony with respect to the position of the handle at the time of the accident.  However, Dr. Van Arsdell ran his one airbag impact test with the handle in the "up" position, thereby conveniently moving the handle out of the way and exposing the seat's back to airbag impact that would not otherwise occur. (*See Exhibit 15*- Pre-test photograph of Van Arsdell's test seat)

Given the fact that Dr. Van Arsdell's test methodology ignored the undisputed facts relative to the position of the Expedition's seat on it track, it should come as no surprise that he also conducted this test with the handle of the exemplar Discovery safety seat in the "up" position, contrary to the evidence of the case.  (*Exhibit 1*, pg. 19; *See Exhibit 15*).  Van Arsdell testified that he was aware of Dr. Hendrix's and Ms. Cottrell's testimony relative to the handle's "down" position, but obviously he chose to ignore it. (*Exhibit 3*, pg. 70, L. 4 – pg. 71, L. 15).  He also admitted that he was unaware of any other witnesses' testimony relative to the position of the handle.  *(Id.,* pg. 70, L. 16-18).

He may try to argue that he saw marks on the handle that led him to conclude that the handle was hit by an airbag, but an expert cannot use his own opinion to replace facts he does not like.  *See Sorenson v. Shaklee Corp.*, 31 F.3d 638 (8th Cir. 1994).  Of course this opinion begs the question as to whether or not Dr. Van Arsdell is competent to even form such a forensic analysis opinion, which plaintiffs have already been proven that he is not.  He could have easily run a second test with the handle "down" but chose not to for obvious reasons since the handle would have shielded the seat back from airbag impact. *(See Exhibit 15)*.

Dr. Van Arsdell's motivation in creating a test setup that ignored the undisputed facts revealed in discovery and substituted his own assumptions instead was obvious - he clearly designed the test setup to try and create the evidence he wanted to find.  If Dr. Van Arsdell had conducted a test **based on the undisputed facts of the case**, with the passenger seat full aft and the handle in the "down" position, not only would the Expedition's airbag have deployed over the CSS as Mr. Whitman's undisputed tests proved, the handle would have shielded the back of

---

[14] *See Exhibit 14*, Photographs of a Discovery with its handle "up" and "down".

the CSS's shell from any airbag impact. (*Id.*)  He could have run additional tests based on these facts, but chose not to do so for obvious reasons.

In violation of the second prong of the *Daubert* analysis, Dr. Van Arsdell employed an unscientific and unreliable test methodology in which he substituted his own unsubstantiated assumptions for the facts revealed during discovery and then attempted to recreate what happened in this case. *Frazier, supra*, 387 F.3d at 1260. By ignoring the facts revealed during discovery and basing his opinions on assumptions contrary to the facts of the case, Dr. Van Arsdell violated the third prong of the *Daubert* inquiry because his self-professed expertise will not help the jury to "understand the evidence or to determine a fact in issue" and will only serve to mislead them. *See Frazier*, *supra* at1260; *Quiet Technology, supra* at 1340-41.

### B.  Van Arsdell's Untested And Speculative Theories For Why The Accident Seat's Shell Shattered And His Test Seat's Shell Did Not

Dr. Van Arsdell conceded that the shell on his airbag test seat did not shatter into half a dozen pieces like Gatlin's seat did. (*Exhibit 1*, pg 23)  Like Evenflo "expert" William Scott, Ph.D., he offered three explanations as to why the test seat's damage did not replicate the accident seat's shattered shell and sawtooth mark. (*Id.*)  Ironically his theories **differed** from Scott's.  Dr. Van Arsdell offered these three theories: 1) The subject CRS was unrestrained and therefore moved further forward towards the airbag before being struck by the airbag; 2) The subject CRS was improperly positioned with the head end more upright and more directly in the path of the deploying airbag; and 3) The right front seat was further forward than it was in Sled Test#1. (*Id.*)

However, when pressed about his methodology as well the scientific basis and factual basis for his theories **which could have easily been tested**, Dr. Van Arsdell reluctantly admitted that he could have run tests to scientifically substantiate his three speculative theories, but chose not to. (*Exhibit 3*, pg. 110, L.20-25 – pg. 114, L.9).

The second prong of the "rigorous" *Daubert/Kumho* analysis requires this Court to determine if the methodologies used by Evenflo's experts to come up with their theories and reach their conclusions are sufficiently reliable to be admissible – or if they are nothing more

than junk science. *Frazier, supra*, 387 F.3d at 1260. In addressing the question of whether an expert's methodology is sufficiently reliable to be admissible, the Court looks to several factors, including whether the expert's theories can be and have been tested. *Id*. at pg. 1262. **It is undisputed that these Van Arsdell theories could have been tested.**[15] In the absence of such testing, each of Van Arsdell's three theories are just that – a theory – an un-tested hypothesis, similarly un-tethered to the facts and offered by a full time professional witness. This is junk science at its worst. *See*, *Haggerty v. Upjohn,* 950 F.Supp. 1160, 1163-64 (S.D.Fla. 1996); *Fee v. Brass Eagle, Inc.*, 2002 WL 1465762 at *4 (N.D. Ohio 2002) (unreported); *Clark v. R.D. Werner Co., Inc*., 2000 WL 666380, *5 (E.D.La. 2000) (unreported).

Consequently, plaintiffs respectfully submit that these untested alternative theories are based on a methodology utilizing sheer speculation and are simply the *ipse dixit* theories of Dr. Van Arsdell and as such, violate F.R.E. 702 and *Daubert*.

### C.      Van Arsdell's Fetter Pin Opinion Is Pure Speculation

Another of Dr. Van Arsdell's speculative sub-opinions that he tries to use to support his airbag impact theory is that the missing "fetter pin" on the subject seat's latch, one of two such pins that are designed to secure the latch to the seat's shell, was somehow "dislodged" and fell out as a result of the airbag striking the seat. (*Exhibit 1*, pg. 30, ¶ 10)

It is unrefuted that no one found the missing fetter pin in the Expedition after the accident. In addition, Dr. Van Arsdell admits he has no personal knowledge of when the pin came out. (*Exhibit 3*, pg. 95, L. 12-15). He admits that there is no testimony from any witness that the pin was in place prior to the accident. (*Id.* at L. 16-25). But most importantly, in his test where he impacted a Discovery at point blank range with an airbag, the impact did **not** dislodge or knock out the fetter pin. (*Id*. at pg. 96, L. 1-5). Nor is he aware of any other airbag impact testing, performed by him or anyone else, that proves his hypothesis. (*Id*. at L.6-19).

---

[15] Astonishingly, Evenflo ran three (3) more sled tests (after their one airbag test with a safety seat in the sled buck's front seat) and **it left the front seat vacant in tests two, three and four**. Obviously, knowing that it did not recreate the extensive damage seen on Gatlin's seat, Evenflo chose not to test any of Dr. Van Arsdell's alternative theories by putting an unrestrained safety seat or a tilted up Discovery in the front seat or moving the vehicle seat full forward during one of these tests, to prove having the safety seat even closer to the airbag would result in the seat shattering and the imposition of a sawtooth pattern mark by airbag impact on the belt hook.

His only basis for this speculative theory was one photograph contained in a NHTSA Special Case Investigation ("SCI") report that shows a fetter pin missing from an Evenflo Discovery that had been impacted by an airbag. (*Id*. at pg. 96, L. 20- pg. 97, L. 20).  But he again reluctantly admits that the report accompanying this photograph did not mention the fetter pin, nor did it establish that it had been in place prior to the impact, that the airbag knocked it out or that the pin had been recovered in the vehicle after the impact. (*Id*.).  As such, it could be yet another instance where the pin was never installed or fell out after installation but **before** the accident, just like what happened in this case.

In the absence of testing proving such a far flung hypothesis, Van Arsdell's "it was knocked out by the airbag" theory is just that – a theory – a hypothesis actually refuted by his own testing, offered by a full time professional witness for the CSS industry.  This rank speculation is junk science at its worst.  *See*, *Haggerty, supra,* 950 F.Supp. at 1163-64; *Fee, supra,* 2002 WL 1465762 at *4; *Clark, supra,* 2000 WL 666380 at *5.

## VI.  CONCLUSION

In the final analysis, and if *Daubert* and its progeny are to have any meaning, Dr. Van Arsdell cannot possibly be found to have the requisite qualifications to offer wide ranging expert testimony on the subject matters at hand.  Frankly, if he can testify about occupant kinematics, injury mechanisms and complex occupant restraint system design issues arising out of the specific facts of this accident, then *any* individual with a mechanical engineering degree can offer "expert" opinions on *any* of these subjects if he or she chooses to do so.

This Court and others have consistently held that there are certain self-proclaimed "experts" who simply do not pass muster under the applicable standards of admissibility. *See, e.g., Alfred, supra; see also, Tokio Marine & Fire Ins. Co., supra,* 958 F.2d at 1175; *Hauck v. Michelin North America, Inc.,* 343 F.Supp.2d 976, 982-83 (D. Colo. 2004); *Wright v. Case Corp.,* 2006 WL 278384, *3 (N.D.Ga. 2006). William Van Arsdell falls into this category of "experts." He is not competent to offer opinions in the four areas outlined above and his opinions

outlined above that are contrary to the facts of the case and have not been tested are neither reliable nor substantiated, and as such they should be excluded.

WILNER BLOCK, P.A.
/s/ Norwood S. Wilner
Norwood S. Wilner
Florida Bar No. 222194
3127 Atlantic Blvd., Suite 3
Jacksonville, Florida 32207
(904) 475-9400
(904) 391-6895 Facsimile
Email: nwilner@wilnerblock.com

and

DOUTHIT FRETS ROUSE GENTILE
  & RHODES, LLC

/s/ Evan A. Douthit
Evan A. Douthit (admitted pro hac vice)
R. Douglas Gentile (admitted pro hac vice)
Christopher J. Stucky (admitted pro hac vice)
903 E. 104th Street, Suite 610
Kansas City, Missouri 64131
(816)941-7600
(816) 941-6666 Facsimile
Email: edouthit@dfrglaw.com
Email: dgentile@dfrglaw.com
Email: cstucky@dfrglaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 27th of August, 2008, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notification of such filing to the following: Timothy J. McDermott, Akerman Senterfitt, 50 North Laura Street, Suite 2500, Jacksonville, FL 32202; Dan Ball, One Metropolitan Square, 211 North Broadway, Suite 3600, St. Louis, MO 63102; and Rick Frawley, 3500 One Kansas City Place, 1200 Main Street, Kansas City, MO 64105.

/s/ Evan A. Douthit
Counsel for Plaintiffs